| | |
|---|---|
| JACOB RIEGER & COMPANY LLC, HEIM MASTER TENANT LLC, HEIM BUILDING LLC, TIGER NOTIONS INC. D/B/A JAZZ A LOUISIANA KITCHEN, LINEAR NOTIONS INC. D/B/A JAZZ A LOUISIANA KITCHEN / PAPA VIC'S THE JIGGER, RACING NOTIONS INC. D/B/A JAZZ A LOUISIANA KITCHEN, VIENNA GROUP LLC D/B/A GRUNAUER, MUSICAL THEATRE HERITAGE, INC., individually and on behalf of other similarly situated insureds,<br><br>        Plaintiffs,<br><br>v.<br><br>THE CINCINNATI INSURANCE COMPANY, INC.,<br><br>        Defendant. | Case No.    20-cv-681<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>Related to: *K.C. Hopps v. The Cincinnati Ins. Co., Inc.*, Case No. 4:20-cv-00437-SRB and *Studio 417, Inc., et al. v. The Cincinnati Ins. Co.*, No. 20-cv-03127-SRB |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Jacob Rieger & Company LLC, Heim Master Tenant LLC, and Heim Building LLC ("Rieger"); Tiger Notions Inc. d/b/a Jazz A Louisiana Kitchen, Linear Notions Inc. d/b/a Jazz A Louisiana Kitchen / Papa Vic's The Jigger, and Racing Notions Inc. d/b/a Jazz A Louisiana Kitchen ("Jazz A Louisiana Kitchen" or "Jazz"); Vienna Group LLC d/b/a Grunauer ("Grunauer"); and Musical Theatre Heritage, Inc. ("MTH Theatre"), individually and on behalf of other similarly situated insureds, for their Class Action Complaint against Defendant The Cincinnati Insurance Company ("Defendant"), state and allege as follows:

1

## NATURE OF ACTION

1. Businesses across the country have been devastated by the ongoing COVID-19 pandemic. Since the disease began to spread rapidly across the country in late February and early March 2020, almost every business has had to shut down or suspend operations, at least for a time, and have taken other drastic and unprecedented action to protect their customers, employees, and general public from COVID-19.

2. Plaintiffs here are no different. Doing business as J. Rieger & Co.; Jazz A Louisiana Kitchen; Grunauer; and MTH Theatre, they are all well known businesses located across the Kansas City metropolitan area that have all been affected in the same way: they have had to close or drastically reduce operations due to COVID-19.

3. Fortunately – or so they thought – Plaintiffs had purchased all-risk commercial property insurance policies from Defendant to protect them in the event of an event such as COVID-19.

4. Plaintiffs promptly made claims for coverage under their Policies. But Defendant has refused to honor its promise to provide the protection that Plaintiffs purchased. Defendants have not paid any funds to date. Rather, it has indicated that coverage is not available for losses arising from COVID-19.

5. Plaintiffs are not unique. The insurance industry – and this Defendant in particular – appears to be taking a uniform approach to the current pandemic: deny coverage even when the policy they drafted and offered to insureds, and the policy paid for by the insureds, does not contain an exclusion for pandemic- or virus-related losses. Based on other lawsuits and other publicly available information, it appears that Defendant is taking a consistent position with other insureds across the country.

6. Defendant's conduct is particularly galling in light of the huge amount of premiums insurers like Defendant receive annually. According to information published by the Insurance Information Institute, the U.S. insurance industry collected net premiums of $1.22 trillion in 2018. Premiums recorded by property/casualty insurers accounted for 51% of that amount. Between 2014 and 2018, these insurers wrote net premiums each year of between $497 billion to $612.6 billion but only incurred losses of between $277.7 billion and $360.9 billion.

7. This is a class action for declaratory judgment and breach of contract arising from Defendant's refusal to pay claims related to COVID-19 as required by its property insurance agreements it sold to Plaintiffs and other insureds.

## PARTIES

*Jacob Rieger & Company*

8. Plaintiff Jacob Rieger & Company is an historic Kansas City distillery, originally founded in 1887 and reestablished in 2014. It distills four core liquor products that are distributed in 23 states. In 2017, Plaintiffs purchased the historic Heim Brewery bottling house, a 48,000 square-foot building built in 1901. In 2018, Plaintiffs began construction to convert the building into its new distillery, which now includes multiple bars, rentable space for private events, and a 3,000 square foot historical exhibit.

9. Plaintiff Jacob Rieger & Company, LLC is a Missouri limited liability company.

10. Plaintiff Heim Master Tenant, LLC is a Missouri limited liability company.

11. Plaintiff Heim Building, LLC is a Missouri limited liability company.

12. As a result of COVID-19 and Stay at Home Orders (as defined below), Plaintiffs Jacob Rieger & Company, LLC, Heim Master Tenant, LLC, and Heim Building, LLC (collectively, "Rieger") have sustained substantial losses.

3

*Jazz, A Louisiana Kitchen*

13. Jazz A Louisiana Kitchen is an authentic cajun-creole restaurant with locations in Kansas City, MO; Kansas City, KS; and Columbia, MO.

14. Tiger Notions Inc. d/b/a Jazz A Louisiana Kitchen is Missouri corporation with its principal place of business in Columbia, MO. Tiger Notions Inc. operates the Jazz A Louisiana Kitchen restaurant in Columbia, MO.

15. Linear Notions Inc. d/b/a Jazz A Louisiana Kitchen DBA Papa Vic's The Jigger is a Missouri corporation with its principal place of business in Kansas City, MO. Linear Notions Inc. operates the Jazz A Louisiana Kitchen restaurant in Kansas City, MO.

16. Racing Notions Inc. d/b/a Jazz A Louisiana Kitchen is a Kansas corporation with its principal place of business in North Kansas City, Missouri. Racing Notions Inc. operates the Jazz A Louisiana Kitchen restaurant in Kansas City, Kansas.

17. As a result of COVID-19 and Stay at Home Orders (as defined below), Plaintiffs Tiger Notions Inc., Linear Notions Inc., and Racing Notions Inc. (collectively, Jazz A Louisiana Kitchen" or "Jazz") have sustained substantial losses.

*Grunauer*

18. Grunauer is an Austrian-German restaurant located in Kansas City's Freight House district.

19. Vienna Group LLC d/b/a Grunauer is a Missouri limited liability company.

20. As a result of COVID-19 and Stay at Home Orders (as defined below), Plaintiff Vienna Group LLC ("Grunauer") has sustained substantial losses.

*MTH Theatre*

21. Musical Theater Heritage is a fully professional theatre that produces musical theater performances. It is located in Kansas City's Crown Center and welcomes nearly 57,000 people to its performances annually.

22. Musical Theatre Heritage Inc. is a Missouri corporation with its principal place of business in Kansas City, Missouri.

23. As a result of COVID-19 and Stay at Home Orders (as defined below), Plaintiff Musical Theatre Heritage Inc. ("MTH Theatre") has sustained substantial losses.

*Cincinnati Insurance Company*

24. Defendant The Cincinnati Insurance Company, Inc., is an Ohio corporation, with its principal place of business in Cincinnati, Ohio.

## JURISDICTION AND VENUE

25. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiffs' causes of action occurred in this judicial district and division. The Policies at issue cover Plaintiffs' facilities located in the State of Missouri, the Policies at issue were purchased from insurance brokers located in the State of Missouri, and/or Defendant is subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

27. The novel coronavirus – named "severe acute respiratory syndrome coronavirus 2" or "SARS-CoV2" – has spread widely and rapidly across the United States. The illness related to SARS-CoV-2 is "novel coronavirus disease 2019," commonly abbreviated to "COVID-19." Although the virus and related illness are distinct, for purposes of this Complaint, Plaintiffs refer to both interchangeably as "COVID-19."

28. Over 1,100 Missourians and over 140,000 Americans have died of COVID-19 and there have been over 37,000 confirmed COVID-19 cases in Missouri and over 3.8 million confirmed cases in the United States, as of the date of this filing, according to the Coronavirus Resource Center at Johns Hopkins University. *See also* Centers for Disease Control and Prevention ("CDC") data.

29. Plaintiffs' insured property has been rendered unsuitable for its intended uses and has been subject to a variety of limitations, restrictions, and prohibitions, including by government Stay at Home Orders imposed by the States of Missouri and Kansas, Counties of Jackson, Boone, and Wyandotte, City of Kansas City, Missouri, City of Columbia, Missouri, and City of Kansas City, Kansas.

30. Orders restricting Plaintiffs' operations are still in effect in Kansas City, Missouri, Kansas City, Kansas, Jackson County, Missouri, Boone County, Missouri, and Wyandotte County, Kansas as of the date of this filing.

31. Plaintiffs also imposed limitations, restrictions, and prohibitions due to the dangerous condition caused by the presence of COVID-19.

## COVID-19

32. A growing body of evidence suggests that the virus transmits both through droplets, when someone sneezes and coughs, and aerosols, which are produced by normal breathing.

33. Aerosols are particularly concerning because unlike droplets, which stay airborne for only a few seconds, aerosols are water droplets suspended in air and can remain suspended for hours, until gravity ultimately forces them to the nearest surface below.

34. Consequently, aerosols can spread widely through air flow and settle on surfaces hundreds of feet away from an infected individual. Thus, someone not even in the vicinity of an infected person can unknowingly touch an infected surface, later touch their face, and become infected.

35. As a result, at least 42 states and countless local governments issued substantially similar "stay at home" orders, the purpose of which was to mitigate and slow the spread of COVID-19.

36. According to the CDC, everyone is at risk of getting COVID-19. The virus can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.[1]

37. According to studies, the virus can live on surfaces for several days if not longer.[2] The New England Journal of Medicine reported finding that experimentally-produced aerosols containing the virus remained infectious in tissue-culture assays, with only a slight reduction in

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[2] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

7

infectivity during a 3-hour period of observations. "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…."[3]

38. The study also found that COVID-19 was detectable for up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[4]

39. All of these materials are used by Plaintiffs throughout their facilities and operations.

40. The study's results indicate that individuals can become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

41. A consensus appears to be emerging that COVID-19 can travel through the air via aerosols. For example, aerosol scientist Lidia Morawska of the Queensland University of Technology in Brisbane, Australia told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[5]

42. An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of COVID-19 on surfaces and in the air about *13 feet* from patients in two hospital wards in Wuhan, China, leading the authors to conclude that the virus spreads in aerosols in addition to large respiratory droplets. The investigators found evidence of the virus in swabs of floors, computer mice, trash bins, bed handrails, patients' face makes, health workers' personal protective equipment, and air vents.[6]

---

[3] https://www.nejm.org/doi/full/10.1056/NEJMc2009324
[4] https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces
[5] https://www.nature.com/articles/d41586-020-00974-w
[6] https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

8

43. The authors also surmised that the high rate of positivity for floor samples in the hospital strongly suggests that droplets fall to the ground and then are spread via patients' shoes. For example, every sample tested from the pharmacy floor tested positive for COVID-19 even though no patients were housed there.[7]

44. Another study conducted in Wuhan indicates that staff movement, floor cleaning, and the removal of personal protective equipment could transmit the virus through the re-suspension of virus-contaminated aerosols.[8]

45. Kimberly Prather, an aerosol chemist at the University of California, San Diego told *Science* magazine: "I'm relieved to see aerosolization is accepted. This added airborne pathway helps explain why it is spreading so fast."[9]

46. Aerosol particles are held in the air by physical and chemical forces. The suspended particles remain for *hours or more*, depending on factors such as heat and humidity. If virus particles can be suspended in air for more than a few seconds, like, for instance, the measles virus can, then anyone passing through could become infected by a virus laden aerosol cloud. And the virus can travel long distances and land on surfaces, only to be stirred back up into the air later by cleaning or other disturbances.

47. The SARS virus that caused a 2003 epidemic is a coronavirus and is similar to COVID-19. As a result, the behavior of SARS during the 2003 epidemic provided evidence about any aerosol risk from COVID-19.

---

[7] https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces
[8] https://www.biorxiv.org/content/10.1101/2020.03.08.982637v1
[9] https://www.sciencemag.org/news/2020/04/you-may-be-able-spread-coronavirus-just-breathing-new-report-finds#

48. A 2014 analysis published in the journal *Clinical Infectious Diseases* investigated a seemingly puzzling outbreak in a Hong Kong apartment complex whose residents had not been in close contact with each other.[10] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[11]

49. The implications of airborne spread of the virus are extremely serious. Airborne spread means that the virus can travel long distances from any infected person. It can then infect someone who unknowingly walks through a pathogenic cloud. It can also infect someone by settling on a physical surface, which someone touches and later becomes infected. And regardless of the transmission method, the evidence suggests that COVID-19 can be transmitted by shoes even once it reaches the ground.

50. State and local governments have determined that without the Stay at Home Orders, COVID-19 could spread rampant throughout the community.

51. The Stay at Home Orders in and around Plaintiffs' property also explicitly acknowledge that COVID-19 causes direct physical damage and loss to property:

   a. the City of Kansas City, Missouri, issued Order 20-01 in response to the pandemic, which states that "the City wishes to employ all means available under the law to protect public life, health, safety and **property** to limit the development, contraction and spread of COVID-19"[12] (emphasis added);

---

[10] https://academic.oup.com/cid/article/58/5/683/365793

[11] *Id.*

[12] http://mediaassets.kshb.com/NWT/Sam/Mayor%20Lucas%20Stay%20at%20Home%20Order.pdf?_ga=2.87564241.83785035.1587504680-1549958454.1581544124

b. the Order from Johnson County, Kansas states that COVID-19 "endanger[s] health, safety and welfare of persons and **property** within the border of Johnson County, Kansas" and that it "remains a public disaster affecting life, healthy, **property**, and the public space.[13] (emphasis added).

### *The Cincinnati Policies*

52. To protect themselves against risks like COVID-19, Plaintiffs purchased insurance policies (the "Policies") from Defendant. The Policies were in effect at the time of the outbreak and remain in effect today. Plaintiffs paid all premiums required by the Policies.

53. Plaintiffs are Named Insureds under their respective Policies.

54. Defendant is the effective and liable insurer of the Policies and policies meeting the class definition.

55. Generally, under property insurance policies like those issued by Defendant to Plaintiffs and class members, the insuring agreements provide coverage for all risks of physical loss or damage to property, unless specifically excluded.

56. The Policies are "all-risk" policies, meaning they cover all losses for direct "loss" to Covered Property unless specifically excluded. Rieger Policy, attached hereto as Ex. A at 29.[14] "Loss" is defined as "accidental physical loss or accidental physical damage." *Id.* at 64.

57. Unless damage is clearly excluded or included within a listed sublimit, the full limit of liability is available for Plaintiffs' damages.

58. As set forth below, the Policies also provide coverage for:

---

[13] https://www.jocogov.org/sites/default/files/documents/CMO/JoCo%20Public%20 Health%20Officer%20Stay%20at%20Home%20Order%203-22-20.pdf

[14] Jazz's Policies are attached to this Complaint as Exs. B (Tiger Notions), C (Racing Notions), and D (Linear Notions). Grunauer's Policy is attached hereto as Ex. E. MTH's Policy is attached hereto as Ex. F. The Policies are materially identical. Except as specifically noted, Plaintiffs cite to Rieger's Policy (Ex. A) as the representative Policy for purposes of this Complaint.

11

a. losses sustained due to the necessary suspension of operations ("Business Income" coverage) (*id.* at 135);

b. interruption of business caused by an order from a civil authority ("Civil Authority" coverage) (*id.* at 136);

c. expenses incurred to minimize suspension of business ("Extra Expense" coverage) (*id.* at 135);

d. losses caused by the prevention of existing ingress or egress at the premises ("Ingress or Egress" coverage) (*id.* at 138); and

e. expenses necessary to protect Covered Property from further damage in the event of a loss ("Sue and Labor" coverage) (*id.* at 139).

59. The Policies define "suspension" to include the "slowdown or cessation of your business activities[.]" Exhibit A at 143.

60. Defendant is obligated to pay for actual loss of **"Business Income"** sustained due to the necessary suspension of operations caused by direct physical loss or damage. Exhibit A at 135. "Business Income" means net income (net profit or loss before income taxes) that would have been earned or incurred in the absence of "loss" as well as continuing normal operating expenses, including payroll. *Id.* at 142. Coverage lasts during the "period of restoration" – beginning at the time of the direct loss and running through the earlier of the date the property is repaired or resumed at a new permanent location. *Id.* at 142. Plaintiffs have suffered lost Business Income due to COVID-19.

61. Defendant also agreed to provide coverage from an interruption to business caused by an order from a **"Civil Authority."** Exhibit A at 136. Specifically, Defendant agreed to "pay for the actual loss of 'Business Income'" that Plaintiffs sustained and "necessary Extra Expense" caused by action of civil authority that prohibits access to" the Covered Property when, due to physical damage to property near the Covered Property, the civil authority prohibits access to property immediately surrounding the damaged property, the Covered Property is within the

12

prohibited area, and the civil authority action is taken "in response to dangerous physical conditions." *Id.* Plaintiffs have suffered losses covered by the Civil Authority provisions due to COVID-19.

62. Defendant also agreed to pay for **"Extra Expense."** Exhibit A at 135. Extra Expenses are expenses to avoid or minimize suspension of business whether or not operations are able to continue and to repair or replace property. *Id.* Plaintiffs have suffered losses covered by the Extra Expense provisions due to COVID-19.

63. The Policies also provide "**Ingress and Egress**" coverage, which requires the insurer to pay for actual loss of Business Income sustained by the prevention of existing ingress or egress at the premises. Exhibit A at 138. Plaintiffs have suffered losses covered by the Ingress and Egress provisions due to COVID-19.

64. Finally, the Polices provide **"Sue and Labor"** coverage, which requires the insured to "[t]ake all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim" in the event of a loss or damage. Exhibit A at 139. Plaintiffs have suffered losses covered by the Sue and Labor provisions due to COVID-19.

### *Plaintiffs' Claims to Cincinnati*

65. Plaintiffs all submitted timely claims to Defendant for coverage under the Policies.

66. Since submitting their claims, Defendant has submitted questions to Plaintiffs regarding their claim that are not necessary to render a coverage decision and/or has denied Plaintiffs' claims.

## CLASS ACTION ALLEGATIONS

67. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiffs bring this action on behalf of themselves and all others similarly situated, and seeks to represent the following nationwide classes:

   a. **Nationwide Declaratory Judgment Class.** All business that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

   b. **Nationwide Breach Class.** All businesses that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

   c. **Missouri Subclass.** All businesses that purchased one of Defendant's Policies in Missouri and are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

68. Plaintiffs' Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as set forth more fully herein.

69. **Numerosity**. COVID-19 has impacted many thousands of businesses across the country and Defendant is a nationwide insurer with, on information and belief, thousands or more policies issued with the relevant provisions. Consequently, the Classes each number in at least the hundreds and most likely thousands, and thus the numerosity standard is satisfied. Moreover, because the members of the Classes are geographically dispersed across the country, and members of the Missouri Subclass are geographically dispersed across the state, if not elsewhere, joinder of all Class members in a single action is impracticable. Class members and Missouri Subclass members may be informed of the pendency of this class action through direct mail or other means based on Defendant's records of its policyholders.

70. **Commonality.** There are questions of fact and law common to the Classes that predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendant's actions include, without limitation, the following:

   a. Do the Policies cover losses resulting from the COVID-19 pandemic?

   b. Do the Policies cover losses resulting from state and local Stay At Home Orders requiring the suspension or reduction in business?

   c. Has Defendant wrongfully denied claims for business losses resulting from COVID-19 and/or the Stay at Home Orders?

   d. Do any of the following provisions in the Policies cover losses due to COVID-19: (i) physical loss or damage to property; (ii) business income; (iii) civil authority; (v) ingress/egress; (vi) extra expense; and/or (vii) sue and labor?

   e. Has Defendant breached its Policies by refusing to cover COVID-19 related losses?

   f. Are Class members entitled to reasonable attorneys' fees and expenses?

71. **Predominance.** The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein. Specifically, many thousands of businesses are impacted by Defendant's denial of coverage for COVID-19 losses and their claims arise from a common factual predicate, which is the nationwide shutdown and suspension of activities due to the virus.

72. **Typicality.** Plaintiffs' claims are typical of those of the Classes as Plaintiffs were subject to the same or similar policy provisions and the losses for all members relate to COVID-19 and the related closure orders and the claims arise from the same legal theories.

73. **Superiority.** A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendant has acted or refused to act on grounds generally

15

applicable to the Class and Missouri Subclass. The presentation of separate actions by individual Class members and Missouri Subclass members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests.

74. **Adequacy**. Plaintiffs are adequate representatives of the Class and Missouri Subclass because they are members of the Class and their interests do not conflict with the interests of those they seek to represent. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel, who have extensive experience prosecuting complex class litigation.

75. **Declaratory Relief and certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure**. On information and belief, Defendant has refused, or intends to refuse, coverage due to COVID-19 business interruption and other covered losses for all, or most, policyholders with covered Policies and final injunctive and/or declaratory relief mandating that Defendant cover the losses of Class members is appropriate respecting the class as a whole.

76. **Issue Class and Modification of Class Definitions and Creation of Subclasses**. In the alternative, Plaintiffs reserve the right to seek certification of one or more common issues pursuant to Rule 23(c)(4). In addition, Plaintiffs reserve the right to modify the definitions of the class and/or create subclasses either by amendment to the complaint or by motion for class certification, including but not limited to subclasses for policyholders under specific Policy provisions.

<u>**COUNT I: DECLARATORY RELIEF**</u>
**(On behalf of Nationwide Declaratory Judgment Class and Missouri Subclass)**

77. The preceding paragraphs are incorporated by reference as if fully alleged herein.

16

78. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

79. An actual controversy has arisen and now exists between Plaintiffs and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. Plaintiffs each requested coverage for COVID-19 related losses. Over the course of various communications with Plaintiffs, Defendant has either denied coverage or made clear that it will deny coverage. Defendant is in breach of its obligations by refusing to provide coverage under the Policies. Moreover, upon information and belief, Defendant has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

80. Plaintiffs contend that Defendant has breached the Policies in the following respects:

   a. Plaintiffs and the class have suffered losses due to COVID-19 covered by the Policies.

   b. Defendant is obligated to pay Plaintiffs and the class for those losses.

   c. Defendant has failed to pay Plaintiffs and the class for those losses.

81. Plaintiffs therefore seek a declaration of the parties' respective rights and duties under the Policies and request the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

### COUNT II: BREACH OF CONTRACT AND/OR ANTICIPATORY BREACH
**(On behalf of Nationwide Breach Class and Missouri Subclass)**

82. The preceding paragraphs are incorporated by reference as if fully alleged herein.

83. Plaintiffs and the class purchased property coverage policies from Defendant.

84. The Policies are valid and enforceable contracts between the Defendant and Plaintiffs and class members.

85. Plaintiffs and the class substantially performed their obligations under the terms of the Policies including giving Defendant notice of their claims. Alternatively, Defendant has waived any terms or conditions of coverage and may not assert any term or condition in the Policy as a defense to liability.

86. Plaintiffs and the class have sustained losses covered by the Policies arising from the COVID-19 virus and associated state and local Stay at Home orders.

87. Over the course of various communications with Plaintiffs, Defendant has either denied coverage or made clear that it will deny coverage. Defendant is in breach of its obligations by refusing to provide coverage under the Policies. Moreover, upon information and belief, Defendant has refused or will refuse other, similar claims claiming that COVID-19 losses are not covered by the Policies. Defendant therefore unjustifiably refuses to pay for losses covered by the Policies, in breach of the Policies.

88. Defendant has refused to pay claims related to COVID-19 on a uniform and class-wide basis, in breach of the Policies.

89. Any conditions precedent to a claim for breach of contract under the Policies have occurred, been satisfied, or, in any event, should be excused or otherwise discarded on the basis of futility or other applicable law.

90. As a direct and proximate result of Defendant's breaches, Plaintiffs and the class have sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request relief and judgment against Defendant as follows:

a. That the Court enter an order certifying the class, appointing Plaintiffs as representatives of the class, appointing Plaintiffs' counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

b. For a judgment against Defendant for the causes of action alleged against it;

c. For compensatory damages in an amount to be proven at trial;

d. For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policies;

e. For pre-judgment and post-judgment interest at the maximum rate permitted by law;

f. For Plaintiffs' attorney's fees;

g. For Plaintiffs' costs incurred; and

h. For such other relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Date: August 24, 2020

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

*s/ Patrick J. Stueve*
Patrick J. Stueve, MO Bar # 13847
Bradley T. Wilders, MO Bar # 78301
Curtis Shank, MO Bar # 66221

Abby E. McClellan, MO Bar # 66069
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:     816-714-7100
Facsimile:     816-714-7101
Email:         stueve@stuevesiegel.com
Email:         wilders@stuevesiegel.com
Email:         shank@stuevesiegel.com
Email:         mcclellan@stuevesiegel.com

**MILLER SCHIRGER LLC**

John J. Schirger, MO # 60583
Matthew W. Lytle, MO #59145
Joseph M. Feierabend, MO #62563
4520 Main Street, Suite 1570
Kansas City, MO 64111
Telephone:     (816) 561-6500
Facsimile:     (816) 561-6501
Email:         jschirger@millerschirger.com
Email:         mlytle@millerschirger.com
Email:         jfeierabend@millerschirger.com

**LANGDON & EMISON LLC**

J. Kent Emison, MO #29721
911 Main Street
PO Box 220
Lexington, Missouri 64067
Telephone:     (660) 259-6175
Facsimile:     (660) 259-4571
Email:         kent@lelaw.com

**SHAFFER LOMBARDO SHURIN, P.C.**

Richard F. Lombardo, MO# 29748
2001 Wyandotte Street
Kansas City, MO 64108
Telephone:     816-931-0500
Facsimile:     816-931-5775
Email:         rlombardo@sls-law.com

*Attorneys for Plaintiffs and the Proposed Classes*

20